John S. WAYS, Sr., Plaintiff,

v.

The CITY OF LINCOLN, d/b/a Lincoln Police Department, Michael Johanns, and Allen Curtis, Defendants.

No. 4:CV94–3265.

United States District Court, D. Nebraska.

Dec. 13, 1995.

Vincent M. Powers, Lincoln, NE, for Plaintiff.

Neal Stenberg, Lincoln, NE, for Defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

■ Based upon qualified immunity, defendants Michael Johanns (Johanns), mayor of Lincoln, Nebraska, and Allen Curtis (Curtis), Lincoln's former chief of police,[1] move for summary judgment regarding claims for money damages asserted against them personally. (Filings 24 (Mot.), 26 (Evid.), 36 (Supp.Evid.).) Plaintiff John S. Ways, Sr. (Ways) has responded by submitting evidence. (Filing 32.) Johanns and Curtis also move, (Filing 37), to strike a portion of Ways's affidavit, (Filing 32), submitted in opposition to the motion for summary judgment.

I shall grant the defendants' motions.

### I. Background

I believe it would be helpful to review those of Ways's claims that assert personal liability against the moving defendants[2] and then review the law of qualified immunity. I turn now to those tasks.

### A. Ways's Claims

The claims which assert personal liability against Johanns and Curtis flow from an amended complaint, (Filing 14), and they are:

(a) Count II—A race-discrimination claim brought under 42 U.S.C. §§ 1981 and 1983 which asserts that Ways, who is black and has a disability, was discriminated against because (i) white police officers with disabilities were accommodated while Ways was not, and (ii) in comparison to white officers, Ways was treated differently with respect to the job-rotation policy;

(b) Count III—A retaliation claim brought under 42 U.S.C. §§ 1981 and 1983 which asserts that inasmuch as Ways prevailed against the City of Lincoln, Nebraska, in a case alleging a racially hostile working environment, the defendants thereafter retaliated against Ways by (i) refusing to accommodate his disability, and (ii) not allowing him to engage in certain activities protected by the First Amendment, such as handing out a petition while off duty;

(c) Count IV—A free-speech claim brought against Curtis under 42 U.S.C. §§ 1981 and 1983 which asserts that Ways's First Amendment rights were violated because (i) he was not allowed to engage in the same First Amendment activities white officers were allowed to engaged in, and (ii) Ways was informed that he was not allowed to engage in First Amendment activities as a police officer.

### B. Qualified Immunity

■ Qualified immunity shields government officials who act within the scope of their duties from suit for monetary damages in their individual capacities so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■ When, as here, the defense of qualified immunity is raised by a motion for summary judgment, the court must look past the allegations of the pleadings and inquire into the facts. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In such a circumstance, in order to defeat a motion for summary judgment based upon qualified immunity, it must be shown that "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. at 3039. The "relevant question" then "is the objective (albeit fact-specific) question" of "whether a reasonable [defendant] could have believed [the challenged conduct] to be lawful, in light of clearly established law and the information the [defendant] possessed." *Id.* at 641, 107 S.Ct. at 3040.

■ When confronted with a motion for summary judgment asserting the defense of qualified immunity, a plaintiff "bears the bur-

---

1. The present police chief was named as a defendant but later dismissed from this suit with prejudice by joint stipulation. (Filing 35.)

2. The first claim under the Americans with Disabilities Act (ADA) cannot impose personal liability on the individual defendants. (Filing 21.) Accordingly, I shall not mention the ADA claim except to the extent necessary to discuss the other claims which have some factual relationship to the ADA claim.

den of going beyond the allegations in his pleadings and coming forward with evidence establishing a genuine dispute regarding" the defendant's actions. *Howard v. Suskie,* 26 F.3d 84, 87 (8th Cir.1994). In *Suskie,* the court of appeals reversed the district court's refusal to grant summary judgment on a qualified-immunity defense in a race-discrimination case where (a) the plaintiff's affidavits failed to show the defendant's decision imposing sanctions was motivated by race, and (b) the defendant's affidavits established that his actions were taken in good faith and on a reasonable basis. *Id.*

■ Thus, even where the defense of qualified immunity turns on a defendant's motivation, when a plaintiff's affidavits "fail to rebut [defendant's] showing that [the actions were taken] in good faith and on a reasonable basis," summary judgment must be granted on the issue of qualified immunity. *Id. See also Wright v. South Ark. Regional Health Ctr., Inc.,* 800 F.2d 199, 203–04 (8th Cir.1986) (applying defense of qualified immunity in a retaliation case, noting that the "defendant's motivation is crucial to the very existence of" plaintiff's claim and finding that there was no "substantial evidence" to support the conclusion that the defendant's "motivation was unconstitutional").

## II. Race Claim

I turn first to the race claim. In this claim, Ways, who is black and has a disability, claims he was discriminated against because (i) white police officers with disabilities were accommodated while Ways was not, and (ii) in comparison to white officers, Ways was treated differently with respect to the job-rotation policy.

I assume for purposes of this decision that the law was clearly established at the time that neither Curtis nor Johanns could discriminate against Ways because of his race.

### A. Facts

I find that the material undisputed facts are as follows:

1. Ways is a black man employed as a police officer for the City of Lincoln, Nebraska, beginning in 1971. (Am.Compl.)

2. For purposes of the motion for summary judgment, I assume Ways has a service-connected disability, to wit: a herniated disc in the lower back that occurred sometime in 1986. (Cripe Aff.Exs. 1, 2; Ways Aff.Exs. 6, 7.)

3. Before Curtis became chief of police in August, 1988, Ways sued the Lincoln Police Department, claiming a racially hostile work environment. (Curtis Aff.; McQuinn Aff. Ex.A, Compl.) Neither Curtis nor Johanns was named a defendant. (*Id.*) Ways's suit was partially successful. *Ways v. City of Lincoln,* 871 F.2d 750 (8th Cir.1989) (affirming racially-hostile-work-environment award against Lincoln Police Department, but also affirming judgment exonerating individual defendants and the City of Lincoln).

4. When Curtis became chief of police, Ways was employed as a police officer on temporary light duty at the "service desk." (Curtis Aff. ¶ 3.) Not long thereafter, Curtis transferred Ways to a "specialized assignment" as a "crime prevention officer." (Curtis Aff. ¶ 4.)

5. Ways was still classified as a "police officer" even though he held a specialized assignment. Ways's responsibility as the crime prevention officer was to act as liaison with the Indian Center (also known as the Multi–Cultural Center), the Malone Center, and the Hispanic Center in Lincoln, Nebraska. Ways was to try to reduce gang membership and drug use by minority youths. While Ways served as the crime prevention officer, he was not required to routinely engage in patrolling or the apprehension and arrest of criminal suspects. (*Id.*)

6. At the time Ways was made the crime prevention officer, it was the written policy of the Lincoln Police Department to require that officers holding specialized assignments be transferred out of those assignments and back to regular duty after three years. (Curtis Aff. ¶ 5.)

7. Specialized assignments were regarded by police officers as "plums." As a general rule, officers on specialized assignments had much more regular daytime hours than those police officers who were not on specialized assignment. In addition, specialized assign-

ments were, and are as a general rule, less hazardous and less physically demanding. Consequently, the positions are much sought after by police officers. (Curtis Aff. ¶ 6.)

8. For a number of years before Curtis became chief of police, the Lincoln Police Union had sought a limitation on the length of time that police officers could serve in specialized assignments. (Curtis Aff. ¶ 7.)

9. In November, 1988, a training update was issued at Curtis's direction which amended Policy M1207 and made rotation of specialized assignments mandatory for the first time. That training update was incorporated in revised Policy M1207 which was promulgated in September, 1990. Curtis promulgated that rule based in part on the insistence of the Lincoln Police Union that such a limitation be imposed. The police union was very interested in seeing the "plums" passed around among police officers. (Curtis Aff. ¶ 8.) Policy M1207 provides that assignments to these [specialized] units will be for a period of three years and that they will take effect in March. (Curtis Aff.Ex. 1.)

10. The Lincoln Police Department also had a policy on "limited duty" which was Policy M1210. Under that policy, which became effective in March, 1991, no officer was to be maintained in limited duty for more than six months. Policy M1210 states in pertinent part that:

> Unless specifically extended by state statute or ordinance, no employee shall be assigned to limited duty for a period exceeding six consecutive months. If, at the end of the six-month period (or statutory period) an employee is unable to satisfactorily perform the full range of duties of the employee's job classification due to physical or mental disability, the employee will be asked to request a disability retirement, or to utilize any accumulated appropriate leave time. At the expiration of the leave time, the employee will be asked to request a disability retirement. If the employee refuses to request a disability retirement, the Department may pursue termination of employment based upon the inability of the employee to perform the duties of the employee's job classification. (Curtis Aff. ¶ 10 & Ex. 2 attached thereto.)

11. On February 5, 1993, Curtis wrote to Ways advising him that in accordance with department policy his specialized assignment would terminate on March 11, 1993, and at that time, he would be assigned to a uniformed team. (Curtis Aff. ¶ 11 & Ex. 3 attached thereto.)

12. Prior to February 5, 1993, Ways had indicated to Curtis, and to the City of Lincoln generally, that he had a back injury which prevented him from performing the duties associated with being a police officer. In his letter to Ways of February 5, 1993, Curtis stated that "your back injury has complicated this matter because it is my understanding that it would preclude you from fulfilling all the obligations of a uniformed police officer." Ways did not dispute that statement at the time Curtis's letter was delivered to him, nor did he dispute the statement at any time while Curtis was chief of police. (Curtis Aff. ¶ 12.)

13. On March 10, 1993, Curtis wrote Ways concerning his ability to return to full duty. In his letter to Ways of March 10, 1993, Curtis advised Ways that he could not permit him to return to work without a written release from his physician authorizing him to return to full duty. Such a release was never provided to Curtis while he was chief of police. (Curtis Aff. ¶¶ 13, 14 & Ex. 4 attached thereto.)

14. In his letter of March 10, 1993, Curtis also indicated he was making a recommendation to the city personnel director that Ways receive disability retirement due to his inability to perform all the functions of a police officer. Following March 11, 1993, Ways remained a member of the Lincoln Police Department, but was placed on a leave of absence. (Curtis Aff. ¶¶ 15–16.)

15. The City of Lincoln provides disability benefits to those officers who are injured in the line of duty and thereby suffer a "total" disability. For purposes of pension benefits, a police officer is considered "totally disabled" when he or she is no longer able to perform the essential functions associated

with the job of police officer. (Cripe Aff. ¶ 3.) A police officer who is injured in the line of duty may be eligible for a disability benefit equal to 50 percent of his average monthly base pay. (Cripe Aff. ¶ 9.)

16. Curtis followed through and submitted a claim for disability benefits on behalf of Ways. (Cripe Aff. ¶ 4 & Ex. 1 attached thereto.) On April 7, 1993, Ways wrote to Cripe concerning his disability pension claim. (Cripe Aff. ¶ 5 & Ex. 2 attached thereto.) Although he claims he did not want to leave the police force and was acting only because he had no other alternative, (Ways Aff. ¶ 22), Ways completed the releases necessary for his disability claim to be processed. (Cripe Aff. ¶¶ 6–8 & Exs. 3–5 attached thereto.)

17. Ways's claim for disability benefits was processed in the ordinary course and he was eventually awarded benefits. Based on his years of experience and earnings, Ways was entitled to a benefit of 50 percent of his average monthly base pay. That came to a monthly disability pension benefit of $1,353.24. (Cripe Aff. ¶ 9 & Ex. 6 attached thereto.)

18. The pension application submitted by Curtis on behalf of Ways was considered by the Disability Pension Review Committee. On December 20, 1993, the committee wrote Johanns recommending that Ways's disability pension be denied because the committee believed Ways could work if various accommodations were made (such as no foot chases). (Cripe Aff. ¶ 10 & Ex. 7 attached thereto.)

19. On January 14, 1994, Johanns rejected the committee's recommendation and granted Ways disability benefits. In so deciding, Johanns determined that Ways was a police officer who was unable to perform the essential functions of being a police officer even with reasonable accommodations. In Executive Order No. 45921, Johanns stated in part that:

After review of said recommendation of denial, which is based upon the assumption that the applicant, a commissioned police officer, could be accommodated by not requiring the applicant to engage in foot chases or foot patrols, by permitting the applicant five minutes of stretching per hour while on cruiser patrol, by providing a lumbosacral support, and providing such other reasonable accommodations as the applicant might request, I conclude that such recommendation is not consistent with the law applicable to a determination of disability by an applicant under the Police and Fire Pension Plan.

A permanent and total disability under the Police and Fire Pension Plan is inability to do the work that a police officer was doing at the time of his accident or other disabling act, and that activity such as foot patrols and foot chases are a normal and essential part of the duties of a police officer of the City of Lincoln.

(Cripe Aff.Ex. 8.)

20. Following March 11, 1993, Ways remained a member of the Lincoln Police Department, but was placed on a leave of absence. (Curtis Aff. ¶ 16.) On or about June 7, 1993, Ways requested to end his leave of absence even though he had been advised that would effectively end his employment with the City of Lincoln. On June 8, 1993, Curtis wrote to Ways outlining the discussion he had with Ways in that regard. He also indicated to Ways in that letter that his decision would effectively end his employment with the City of Lincoln as of June 16, 1993. (Curtis Aff. ¶¶ 18–19 & Ex. 6 attached thereto.) Ways's employment as a police officer thus ended.

21. While Curtis was chief of police, several white officers, some of them with injuries affecting their ability to do regular police work, were required to rotate back into regular patrol duties. In fact, one police officer who was required to rotate, Greg Roake, left the department because of a torn rotator cuff. Roake, who is white, received a disability pension like Ways. Roake filed a grievance that was denied by the personnel board. The personnel board specifically upheld the policy requiring police officers to rotate out of specialized assignments after three years. (Curtis Aff. ¶ 21.)

22. Johanns became mayor of the City of Lincoln in May, 1991. The rotation policy was in force at that time. Johanns discussed the policy with Curtis, but did not give him

any direction on the matter. (Johanns Aff. ¶¶ 1–2.)

23. The decision to rotate Ways in March, 1993, was made by Curtis. Johanns was aware of the decision, but he did not give Curtis any directives concerning Ways other than to make sure Curtis treated Ways like everyone else. (Johanns Aff. ¶ 3.)

### B. Analysis

■ As noted, Ways, who is black and has a disability, claims he was discriminated against because (i) white police officers with disabilities were accommodated while Ways was not, and (ii) in comparison to white officers, Ways was treated differently with respect to the job-rotation policy.

I shall grant the motion for summary judgment based upon qualified immunity as to Curtis and Johanns for two reasons. Initially, there is no competent evidence that white police officers with disabilities were accommodated while Ways was not, and there is no competent evidence that in comparison to white officers Ways was treated differently with respect to the job-rotation policy. Moreover, there is no competent evidence that either Curtis or Johanns was aware of any difference in treatment along racial lines, assuming for the sake of argument that such differences in treatment in fact existed. I shall elaborate.

First, in order for a party to create a genuine issue of material fact by filing an affidavit alleging the existence or nonexistence of facts, the affidavit must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). At a minimum, this means the affidavit must establish the competence of the affiant to testify about the subject matter of his or her affidavit. *See, e.g.,* Fed.R.Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1367 (8th Cir.1983) (sustaining grant of motion for summary judgment where opposition affidavit about reaction of a third person was not based

upon personal knowledge of affiant, but rather was based on the surmise of the affiant); *Cummings v. Roberts,* 628 F.2d 1065, 1068 (8th Cir.1980) (applying Rule 56(e), reversing district court's grant of summary judgment, and holding that affidavit by jail officer that investigation revealed certain facts about the condition of the plaintiff was not based upon personal knowledge and, thus, could not form basis for grant of summary judgment); 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 486–89 & n. 36 (1983) (collecting cases).

In paragraphs 17–18 of his affidavit, (Filing 32 Ex. 1), Ways makes various factual allegations about how various white officers were treated in terms of their disabilities or in regard to job rotation, introducing his assertions by stating "I know...." Paragraph 19 is similar, but it does not even make a generalized assertion that Ways "knows." Paragraphs 28 and 29 of the affidavit make similar conclusory allegations.

The difficulty with these assertions is that Ways never explains why or how he "knows." Moreover, in numerous supplemental affidavits, most if not all of the persons mentioned in Ways's affidavit specifically refute his unsupported claims. (Filing 36, Starr Aff.; Becker Aff.; Winkler Aff.; Curtis Supp. Aff.; Breen Aff.; Sorensen Aff.; Arthur Aff.; Domangue Aff.; McMeen Aff.) For example, without any showing of how he "knows," Ways asserts that Officer "Star" [*sic*] has a "deafness problem." (Ways Aff. ¶ 18.) Yet, Starr swears that he does not "have a hearing impairment of any kind." (Starr Aff. ¶ 2.)

Accordingly, since Ways has not complied with Fed.R.Civ.P. 56(e), I shall strike paragraphs 17–19 (and paragraphs 28–29, which make similar conclusory allegations) of his affidavit for the reason that Ways has not established that he has personal knowledge and, thus, his statements are incompetent and inadmissible in evidence. Without the facts stated in Ways's affidavit, there is no factual predicate for his claim of disparate treatment on the basis of race, and the motion for summary judgment as to these de-

fendants must be granted on the defense of qualified immunity.

Second, and equally important, there is no competent evidence to show that either Curtis or Johanns was aware of any difference in treatment along racial lines, assuming for the sake of argument that such differences in treatment in fact existed. Specifically, there is no claim in Ways's affidavit that either Curtis or Johanns was aware of the examples of differences in treatment described by Ways in his affidavit. (Ways Aff.) Without this evidence, even assuming differences in treatment, no reasonable official would "understand *that what he is doing violates that right.*" *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039 (emphasis added). Consequently, even if white and black officers were in fact treated differently, since there is no evidence that these senior managers had any knowledge of the alleged differential treatment of white officers compared to Ways, Johanns and Curtis have qualified immunity.

### III. Retaliation Claim

■ I turn next to the retaliation claim brought under 42 U.S.C. §§ 1981 and 1983. This claim asserts that inasmuch as Ways prevailed against the Lincoln Police Department in *Ways v. City of Lincoln,* 871 F.2d 750 (8th Cir.1989), Curtis and Johanns retaliated against Ways by (i) refusing to accommodate his disability, and (ii) not allowing him to engage in certain activities protected by the First Amendment, such as handing out a petition while off duty.

I assume for purposes of this decision that the law was clearly established at the time that neither Curtis nor Johanns could retaliate against Ways by refusing to accommodate his disability or not allowing him to engage in certain activities allegedly protected by the First Amendment as punishment for exercising his right to file suit in federal court pursuant to the civil rights statutes.

### A. Facts

I find that the material undisputed facts are as follows:

1. The facts enumerated in part IIA above are incorporated herein.

2. The judgment in *Ways v. City of Lincoln,* 871 F.2d 750 (8th Cir.1989), was entered on March 3, 1988, before Curtis became chief of police. (Curtis Aff. ¶ 27.) Although Curtis worked with Ways and his lawyer regarding enforcement of the judgment, (Curtis Aff. ¶ 28), Ways never complained to Curtis that he was being "retaliated against" for filing the suit. (Curtis Aff. ¶ 29.)

3. The first time Curtis became aware of the retaliation claim was when this suit was filed, some six years after the jury returned its verdict for Ways in the prior lawsuit. (Curtis Aff. ¶ 29.) Ways does not claim he made such complaints to Johanns either. (Ways Aff.)

4. Ways does not dispute, but in fact agrees with, the finding of the review board that he had a disability and should not be required to make an arrest if the arrest involved a foot chase. (Ways Aff. ¶ 21 ("I agree with the determination of the Police and Fire Pension Review Board...."); Cripe Aff. ¶ 10 & Ex. 7, Letter from Disability Pension Review Comm. ("We recommend ... no foot chases....").)

5. On or about March 25, 1993, Curtis became aware that Ways was circulating a petition in Lincoln, Nebraska, calling for the discharge of one of Ways's superior officers, Sgt. Kent Woodhead. (Curtis Aff. at ¶ 31.)

6. Prior to that time, Sgt. Woodhead had shot and killed a Native American named Seth Whiteface. The shooting was investigated by the Nebraska State Patrol, which found no evidence of wrongdoing. In addition, the shooting was found to be justifiable and lawful by a Lancaster County grand jury and the police department's independent investigation. (Curtis Aff. ¶ 32.)

7. Curtis was very concerned by the fact that Ways was circulating the petition in question. It was his belief that Ways's circulating a petition calling for the discharge of his superior officer would greatly undermine the morale of the department and erode working relationships within the department. His concerns in this regard rested in part on the fact that he was contacted by Al Burnt, president of the Lincoln Police Union at the

time. Burnt advised Curtis that he had received a number of complaints about the circulation of the petition from other police officers. (Curtis Aff. ¶ 33.)

8. Assistant Police Chief John Becker was asked to investigate. Becker did so by contacting Mrs. Alberta Marsh on March 25, 1993. (Becker Aff. ¶ 6.)

Becker made a tape recording of his conversation with Mrs. Marsh. A verbatim transcript of that recording is attached to Becker's affidavit as Exhibit 1. (Becker Aff. ¶ 9.) During the course of that conversation, Mrs. Marsh stated that Ways had handed a petition to a Mr. Hugh Bullock, who then circulated the petition around the Indian Center. The petition referred to the shooting of Seth Whiteface by Sgt. Kent Woodhead and called for Sgt. Woodhead to be discharged from the police force. Specifically, Alberta Marsh stated to Becker that:

BECKER: Can I stop you for just a minute. We need the incident you talked about, the petition was talking about involved one of our Lincoln police officers, is that correct?

MARSH: Yes.

BECKER: And would that have been involved with the shooting of a gentleman by the name of Seth Whiteface last summer?

MARSH: Yes.

BECKER: And the petition involved there was talking about that situation. Do you remember specifically, did you read the petition? Um, do you remember Mrs. Marsh what the petition was asking for? Normally a petition is they want people to sign to support something. Do you remember what that petition was asking or wanting you to support?

MARSH: Yes, it was concerning a discharging a police officer.

BECKER: Okay.

MARSH: (Inaudible response)

BECKER: Okay, when you say discharging, are you saying having him fired, having him moved?

MARSH: Yes, removed, removed from the police department.

BECKER: Okay, removed from the police department?

MARSH: Yes.

(Becker Aff.Ex. 1.)

9. After concluding his conversation with Alberta Marsh, Becker communicated to Curtis that Ways had participated in circulating a petition at the Indian Center calling for Sgt. Woodhead to be discharged from his employment. (Becker Aff.Ex. 2.)

10. After discussing the matter with John McQuinn, legal counsel for the police department, Curtis determined that it would be appropriate to write a letter to Ways ordering him to cease and desist from circulating the petition in question. A copy of Curtis's letter to Ways is attached to Curtis's affidavit as Exhibit 7. (Curtis Aff. ¶ 34.)

11. In his affidavit in opposition to the defendants' motion for partial summary judgment, Ways states, and I assume, that he circulated the petition at the Indian Center as head of the NAACP in Lincoln, Nebraska. (Ways Aff.) However, Ways maintains in his affidavit that the object of the petition was simply to have Sgt. Woodhead transferred from his position as head of the Internal Affairs Department, not to have Woodhead discharged from the police force. (Id.)

12. Curtis swears, and it is undisputed, that shortly after receiving the letter of March 25, 1993, Ways scheduled an appointment to see him. Curtis states that during the course of their meeting Ways apologized for his actions. ("Ways admitted that he had acted improperly in circulating the petition and promised that he would not do so in the future.") Furthermore, Ways did not at any time during the conversation dispute the contention contained in the March 25, 1993, letter that he had been circulating a petition "requesting the termination of Sgt. Kent Woodhead." In fact, the first Curtis knew that Ways was claiming to the contrary was when he read Ways's affidavit in this case. (Curtis Aff. ¶ 35; Curtis Supp.Aff. ¶ 6.)

13. Curtis also states in his affidavit that the only directive he ever gave Ways was not to circulate a petition calling for Sgt. Woodhead to be terminated from the police force. The undisputed evidence indicates that Cur-

tis never gave Ways a directive telling him he was prohibited from circulating a petition calling for Woodhead to simply be reassigned within the Lincoln Police Department. (Curtis Supp.Aff ¶ 5.) It is also undisputed that Ways was never reprimanded or otherwise punished for circulating a petition (whatever its content) at the Indian Center. The letter sent to Ways was never made part of his personnel file. (Curtis Aff. at ¶ 36.)

14. To the best of Curtis's knowledge, no white police officer ever circulated a petition calling for the discharge of a fellow officer·or superior officer while he was chief of police. Had any white officer done so, that officer would have been treated the same as Ways. (Curtis Aff. ¶ 37.)

15. Johanns was aware that on or about March 25, 1993, Curtis directed Ways to stop circulating a petition calling for the discharge of Sgt. Woodhead. The decision to do that was made by Curtis, and he merely advised Johanns of the action taken by him in this regard. Johanns did not give Curtis any type of directive or order with respect to that incident. (Johanns Aff. ¶ 5.)

### B. Analysis

#### 1.

Ways's retaliation claim is much like the retaliation claim found wanting in *Wright v. South Ark. Regional Health Ctr., Inc.*, 800 F.2d at 203–05. Here, as in *Wright,* the defendants' "motivation is crucial to the very existence of a constitutional claim," but "the record simply does not create a genuine issue of material fact" that either Curtis or Johanns had a retaliatory motive. *Id.*

There simply is no evidentiary connection between the alleged reason for the retaliation (the 1988 lawsuit and judgment) and the retaliation itself (the 1993 disability decision or the 1993 letter admonishing Ways regarding the Woodhead petition) that would permit a rational finder of fact to conclude that Curtis and Johanns had a retaliatory motive when they acted. I arrived at this conclusion for six reasons.

First, neither Curtis nor Johanns was a party to the previous litigation. Moreover, neither Curtis nor Johanns held their respective positions as chief of police and mayor at the time the judgment was entered. Thus, these men had no obvious personal motive for striking back at Ways.

Second, the time between the judgment and the alleged retaliatory action was approximately five years. The long interval between the two ·events strongly suggests they are not connected.

Third, the evidence reflects that a white officer was treated just like Ways from a disability standpoint. Greg Roake was forced to leave the department because of a torn rotator cuff. Roake, who is white, received a disability pension as did Ways. Roake filed a grievance that was denied by the personnel board. The personnel board specifically upheld the policy requiring police officers to rotate out of specialized assignments after three years. Moreover, Ways does not dispute, but in fact agrees with, the finding of the review board that he too had a disability and should not be required to make an arrest if the arrest involved a foot chase. (Ways Aff. ¶ 21 ("I agree with the determination of the Police and Fire Pension Review Board...."); Cripe Aff. ¶ 10 & Ex. 7, Letter from Disability Pension Review Comm. ("We recommend ... no foot chases....").)

While Ways disagrees with Johanns's decision to award a pension rather than grant an accommodation as suggested by the review board, there is no mistaking the fact that Curtis and Johanns treated Ways like the white officer, Roake. Thus, there is compelling evidence to suggest that white and black officers who are disabled are treated in a similar fashion. This evidence in turn suggests that the prior race-based lawsuit and judgment did not motivate Curtis or Johanns with regard to the question of disability.

Fourth, Curtis has sworn, and Ways has not disputed, that no white police officer ever circulated a petition calling for the discharge of a fellow officer or superior officer while he was chief of police. According to Curtis, had any white officer done so, that officer would have been treated the same as Ways. In this regard, it is undisputed that before he wrote to Ways Curtis consulted with the city attorney's office to assure himself that his actions were lawful. This evidence in turn suggests

that the prior race-based lawsuit and judgment did not motivate Curtis with regard to the petition, but rather that Curtis was motivated by Ways's unusual and disruptive conduct.

Fifth, Ways's action in circulating the petition caused the president of the police union to complain to Curtis about Ways's conduct. This evidence strongly indicates that Curtis was motivated by concerns about labor unrest and employee morale flowing from Ways's petition, not Ways's prior lawsuit and judgment.

Sixth, Ways was never reprimanded or otherwise punished for circulating the petition. Moreover, Curtis's letter to Ways was never even made part of Ways's personnel file. This complete lack of discipline suggests that Curtis was motivated not by a desire to strike back at Ways for his prior lawsuit regarding race, but rather that Curtis was motivated to preserve employee morale.

### 2.

I think it advisable to address briefly two factual assertions made by Ways. These assertions are apparently made in an effort to establish a factual predicate for Ways's retaliation claim. I turn to those assertions now.

### a.

Ways claims, and for purposes of the motion I assume his claim is true, that white officers have publicly criticized, without warning from their police superiors, a grand jury's decision to indict white officers regarding the death of an Hispanic person. However, there are two reasons why this evidence would not permit a rational jury to find that Curtis or Johanns retaliated against Ways because of his prior lawsuit and judgment.

Simply put, the two situations are vastly different in terms of judging the motivation of managers of a police department. On one hand, Ways's petition (whatever its content) clearly impacted upon the morale of the police department because Ways was making or facilitating the making of a complaint *against a superior officer.* Indeed, the undisputed evidence reflects that Ways's petition prompted a complaint from the president of the police union. On the other hand, there is no evidence that the actions of the white officers mentioned by Ways caused similar labor unrest. Thus, Ways wrongly compares "apples with oranges" in an effort to evaluate whether Curtis or Johanns retaliated against him for filing the prior lawsuit.[3]

I do not wish to be misunderstood. The issue is whether Curtis or Johanns retaliated against Ways because of the prior race-based lawsuit. In this context, I am not asked to judge whether white police officers should be allowed to criticize the judicial system while a black police officer may be directed not to call for the firing of a superior officer.

I have ruled only that this comparative evidence does not have any probative value in proving that Curtis or Johanns retaliated against Ways for filing the prior race-based lawsuit. This is true because there is no evidence that the actions of the white officers caused labor unrest in the police department, while there is undisputed evidence that Ways's actions did cause labor unrest.

Still further, I emphasize that these incidents involving the white officers have precious little to do with Curtis. It is undisputed that the actions of the white officers mentioned in Ways's affidavit took place *after* Curtis was no longer chief of police. (Curtis Supp.Aff. ¶ 7.) It makes no sense to determine whether Curtis is entitled to qualified immunity regarding his treatment of Ways based upon his management of white police officers when Curtis did not supervise the white officers during the time they are said to have acted.

### b.

Next, Ways states in his affidavit that the petition he circulated did not call for the termination of his superior officer but only for his reassignment. (Ways Aff. ¶ 5.) I assume for the sake of argument that Ways's affidavit is true. Nevertheless, this fact does

---

**3.** The same is true for Ways's assertions that white officers have run for public office without criticism by their police superiors.

not change the foregoing analysis for at least two reasons.

Regardless of what Ways actually did, Curtis had reason to believe Ways was in fact publicly calling for the firing of a superior officer. Assistant Chief John Becker was asked to investigate this situation. Becker did so by contacting Mrs. Alberta Marsh on March 25, 1993. Becker made a tape recording of his conversation with Mrs. Marsh. During the course of that conversation, Mrs. Marsh stated that Ways had handed a petition to a Mr. Hugh Bullock, who then circulated the petition around the Indian Center. The petition referred to the shooting of Seth Whiteface by Sgt. Kent Woodhead and called for Sgt. Woodhead to be discharged from the police force. This information was reported to Curtis. Accordingly, it was perfectly understandable for Curtis to take the position that Ways had in fact publicly sought the firing of a superior officer, and this evidence in turn suggests lack of a retaliatory motive.

Moreover, even if it is true that Ways did not call for the termination of his superior officer, I also recognize that Ways arranged a meeting with Curtis and apologized to Curtis for his behavior. Ways's apology was essentially an admission that Curtis had a reasonable basis for "calling Ways on the carpet" (but not otherwise punishing him) regardless of the specific content of the petition.

### IV. Free–Speech Claim

I next examine Count IV. This is a free-speech claim brought against Curtis under 42 U.S.C. §§ 1981 and 1983 which asserts that Ways's First Amendment rights were violated because (i) he was not allowed to engage in the same First Amendment activities that white officers were allowed to engage in, and (ii) Ways was informed that he was not allowed to engage in First Amendment activities as a police officer.

The undisputed facts regarding this claim are set forth in parts IIA and IIIA above. I shall not restate those facts, but rather incorporate them herein by reference.

In order to give Ways the benefit of the doubt if this case were tried on the merits,[4] I would assume that his claim called for application of the so-called balancing test set forth in *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *See, e.g., Kincade v. City of Blue Springs, Mo.*, 64 F.3d 389, 397–98 (8th Cir.1995) (where a public employee's speech touched upon a matter of public concern, a court must apply *Pickering* and "balance" the employee's "free speech rights against the interest of the City"). This is a fact-intensive inquiry. *Id.* at 398.

Because this inquiry is fact intensive, " 'the asserted First Amendment right' can rarely be considered 'clearly established' for purposes of the *Harlow* qualified immunity standard." *Id.* (quoting *Buzek v. County of Saunders*, 972 F.2d 992, 997 (8th Cir.1992) (in turn quoting *Bartlett v. Fisher*, 972 F.2d 911, 916 (8th Cir.1992))). And where officials present "specific and unrefuted evidence [that plaintiff's speech] ... substantially disrupted the work environment," the official is entitled to qualified immunity because the plaintiff's right cannot by definition be "clearly established." *Id.* (applying *Grantham v. Trickey*, 21 F.3d 289, 292–95 & n. 4 (8th Cir.1994)).

This is a case where specific unrefuted testimony has been presented that Ways's activity substantially disrupted the work environment at the police station; therefore, the defense of qualified immunity has been established. For example, it is undisputed that the president of the police union complained to Curtis about Ways's activities. Still further, it is undisputed that Ways apologized to Curtis for his conduct, essentially admitting that his actions had caused disruption in the police department.

In addition, application of the defense of qualified immunity is particularly justified in this case because the legal issue regarding the *Pickering* test is a very complex one and Curtis sought legal advice on the subject before he acted. The Eighth Circuit Court of Appeals has recognized that where, as

---

**4.** It is not at all clear in the Eighth Circuit that Ways would have the benefit of the *Pickering* test since he was not punished for his speech in any way. Indeed, the letter Curtis wrote Ways was not even placed in Ways's personnel file.

here, the public official consulted legal counsel on a difficult legal issue before the official acted, such consultation goes far toward establishment of the defense of qualified immunity. *Compare Tubbesing v. Arnold,* 742 F.2d 401, 407 (8th Cir.1984) *with Kincade,* 64 F.3d at 399.

For reasons similar to those discussed in part IIIB2 above, it is appropriate to address two factual assertions by Ways that I assume are true for purposes of the motion for summary judgment.

As noted earlier, Ways claims, and for purposes of the motion I assume his claim is true, that white officers have publicly criticized, without warning from their police superiors, a grand jury's decision to indict white officers regarding the death of an Hispanic person. However, this evidence (or evidence about white officers running for office) is not probative of anything material on the defense of qualified immunity regarding the free-speech claim because (a) there is no evidence that the actions of the white officers caused labor unrest, and (b) these incidents took place after Curtis was chief of police. Thus, the fact that white officers did one thing and faced no sanctions while a black officer did a qualitatively different thing and was admonished to refrain from that activity provides no reason to deny the defense of qualified immunity.

Furthermore, as observed earlier, Ways states in his affidavit that the petition he circulated did not call for the termination of his superior officer but only for his reassignment. This evidence, which I assume to be true for purposes of this motion, is also not probative of anything material on the defense of qualified immunity regarding the free-speech claim.

Assistant Chief Becker investigated the matter and tape-recorded a statement from an eyewitness. The eyewitness stated that Ways had in fact called for the firing of his superior officer, and this information was communicated to Curtis. Since this information was reliable, Curtis had a right to rely upon it. *Waters v. Churchill,* —— U.S. ——, ——, 114 S.Ct. 1878, 1888, 128 L.Ed.2d 686 (1994) (First Amendment does not preclude government, as employer, from reasonably relying upon hearsay or other factors when determining the factual issue of what an employee's speech consisted of for purposes of determining whether to discipline the employee.). Curtis's reliance on this information is all the more reasonable given Ways's apology to Curtis. Thus, the fact that Curtis may have relied upon information that was incorrect is no reason to deny him qualified immunity.

## V. Conclusion

Curtis and Johanns have qualified immunity regarding the prayer for monetary damages asserted against them on the race claim (Count II), the retaliation claim (Count III), and the free-speech claim (Count IV).

The defense of qualified immunity is established as to the race claim because: (a) there is no competent evidence that white police officers were accommodated while Ways was not; (b) there is no competent evidence that in comparison to white officers, Ways was treated differently with respect to the job-rotation policy; and (c) there is no competent evidence that either Curtis or Johanns was aware of any difference in treatment along racial lines, assuming for the sake of argument that such differences in fact existed.

The defense of qualified immunity is established as to the retaliation claim because: (a) neither Curtis nor Johanns was a party to the previous litigation and thus had no motive for striking back at Ways; (b) the time between the prior lawsuit and the acts of alleged retaliation is too long to serve as evidence of a connection; (c) the evidence reflects that white officers were treated like Ways for disability purposes and this in turn suggests that the prior race-based lawsuit was not a motivating factor; (d) no white officers ever circulated a similar petition calling for the firing of a superior officer; (e) Curtis consulted legal counsel before he acted, suggesting that Ways's disruptive conduct, not the prior lawsuit, was the motivating factor regarding Curtis's decision on the petition; (f) Curtis was confronted with labor unrest arising from Ways's actions, and this evidence suggests that such labor unrest, not the prior lawsuit, was the motivating factor regarding Curtis's decision on the petition;

and (g) Ways was not punished regarding the petition and this complete lack of punishment suggests that Curtis was not motivated by a desire to punish Ways for the prior lawsuit.

The defense of qualified immunity is established as to the free-speech claim because: (a) given the fact-intensive nature of the *Pickering* balancing test and the fact that there is specific unrefuted evidence that Ways's conduct caused disruption at the police station, it cannot be said that Ways's right to speak was "clearly established"; and (b) given the fact that the legal issue surrounding the *Pickering* balancing test is complex and Curtis sought legal advice before he acted, it cannot be said that Curtis would have known his actions violated a "clearly established" right.

Accordingly,

IT IS ORDERED that:

(1) The motion (Filing 37) to strike a portion (paragraphs 17–19, 28–29) of Ways's affidavit (Filing 32) submitted in opposition to the motion for summary judgment is granted;

(2) The motion for summary judgment (Filing 24) submitted by Johanns and Curtis based upon the defense of qualified immunity is granted as to Counts II, III, and IV of the amended complaint.