David C. SCHULTZ, et al

v.

Martin J. KELLY, et al

No. CIV. A. 99–30139–MAP.

United States District Court,
D. Massachusetts.

Feb. 21, 2002.

David C. Schultz, Patricia W. Schultz, Clearwater, FL, for Plaintiffs.

Joseph L. Tehan, Jr., Kopelman & Paige, P.C., Jonathan M. Silverstein, Kopelman & Paige, Boston, MA, for Defendants.

*MEMORANDUM AND ORDER RE-GARDING REPORT AND RECOMMENDATION ON THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT*

(Docket No. 74)

PONSOR, District Judge.

David and Patricia Schultz have brought this civil rights action against the members of the Board of Selectmen of the Town of Brimfield regarding a by-law that purports to regulate flea market activity within the Town. Following discovery, both sides filed motions for summary judgment. These motions were referred to Magistrate Judge Kenneth P. Neiman for Report and Recommendation.

On January 24, 2002, the Magistrate Judge issued his Report and Recommendation, to the effect that the defendants' Motions for Summary Judgment (Docket Nos. 44–46) be allowed with one exception. To the extent that the plaintiffs were seeking a limited declaratory judgment in Count II, the Magistrate Judge recommended that the defendants' motions be denied.

With regard to the plaintiffs' Motion for Summary Judgment (Docket No. 50), he recommended that it be denied, except insofar as the plaintiffs were seeking a limited declaratory judgment with respect to Count II. The Report and Recommendation concluded at 42 that the district court should issue a declaratory judgment to the effect that "the bylaws' definition of a 'flea market' does not apply to the Brimfield Barn and plaintiffs' early bird shows conducted therein to the extent those activities are not conducted 'primarily in the out-of-doors.' "

No party has objected to the Report and Recommendation. Having reviewed the lengthy and scrupulous Report and Recommendation *de novo,* the court hereby adopts it, without opposition. The defendants' Motions for Summary judgment are hereby allowed, except as to the limited declaratory judgment requested in the plaintiffs' complaint at Count II, and the plaintiffs' Motion for Summary Judgment is hereby denied, except for the declaratory judgment set forth in the Magistrate Judge's Report and Recommendation at 42.

The clerk is ordered to enter judgment for the plaintiffs and the defendants in accordance with the Report and Recommendation. This case may then be closed.

It is So Ordered.

*REPORT AND RECOMMENDATION WITH REGARD TO THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT (Docket Nos. 44, 45, 46 and 50)*

NEIMAN, United States Magistrate Judge.

David Schultz ("Schultz") and his wife Patricia (collectively "Plaintiffs") have filed a multi-count civil rights action against the members of the Board of Selectmen of the Town of Brimfield (hereinafter "Brimfield" or "the town"): President Martin Kelly ("Kelly") and Selectmen John Klimczak ("Klimczak") and Mark Denning ("Denning") (collectively "Defendants").[1] Plaintiffs' action centers around a New England institution, the Brimfield Flea Market, and, more specifically, a municipal bylaw that purports to regulate all flea market activity within the town. Plaintiffs, proceeding pro se, allege that, among other actions, Defendants' interpretation of the

---

**1.** Plaintiffs report that as of June 4, 2001, only one of the three defendants remains on Brim-field's Board of Selectmen. (See Docket No. 70.)

bylaw has caused, and continues to cause, them redressable harm.

The parties' Fed.R.Civ.P. 56 motions for summary judgment—one from each Defendant and one from Plaintiffs—have been referred to this court for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B). For the reasons indicated below, the court will recommend that Defendants' motions for summary judgment be allowed in all but one, declaratory judgment, respect and that Plaintiffs' motion be allowed with respect to one declaratory judgment, but otherwise denied.

## I. STANDARDS

A court may grant summary judgment pursuant to FED. R. CIV. P. 56(c) if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995). A "genuine" issue is one "that a reasonable jury could resolve ... in favor of the nonmoving party." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995). *Accord United States v. One Parcel of Real Property, Great Harbor Neck, New Shoreham, R.I.*, 960 F.2d 200, 204 (1st Cir.1992).

Not every genuine factual conflict, however, necessitates a trial. " 'It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared.' " *Parrilla–Burgos v. Hernandez–Rivera*, 108 F.3d 445, 448 (1st Cir. 1997) (quoting *Martinez v. Colon*, 54 F.3d 980, 983–84 (1st Cir.1995)). At bottom, matters of law are for the court to decide at summary judgment. *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996).

The mere fact that both parties move for summary judgment does not change the foregoing analysis. *United Paperworkers Intern. Union Local 14, AFL–CIO–CLC v. International Paper Co.*, 64 F.3d 28, 32 n. 2 (1st Cir.1995). Barring special circumstances, a court must consider each motion separately, drawing inferences against each movant in turn. *EEOC v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 608 n. 8 (1st Cir.1995).

Finally, as applicable here, a court must take special care when viewing pro se litigants' submissions which, "however inartfully pleaded," are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). *See Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Still, even civil rights plaintiffs proceeding pro se are required to "allege facts, and not mere conclusions, in support of [their] claim[s]." *Gallego v. Wilson*, 882 F.Supp. 1169, 1172 (D.Mass.1995). *See Romero–Barcelo v. Hernandez–Agosto*, 75 F.3d 23, 28 n. 2 (1st Cir.1996); *Fisher v. Flynn*, 598 F.2d 663, 665 (1st Cir.1979).

## II. FACTUAL BACKGROUND

There is no dispute to the following background taken directly from Defendants' Local Rule 56.1 statement of facts (Docket No. 47, hereinafter "Defs.' L.R. 56.1 Statement"), Plaintiffs' statements of "material" and "controverted" facts filed in response thereto (both included within Docket No. 50)[2], Plaintiffs' own statement

---

**2.** Plaintiffs' statement of "material" facts is

hereinafter referred to as "Pls.' Statement of

of undisputed facts (Docket No. 52, hereinafter "Pls.' L.R. 56.1 Statement") and Defendants' factual response thereto (Docket No. 55, hereinafter "Defs.' L.R. 56.1 Response"). *See Bogdahn v. Hamilton Standard*, 973 F.Supp. 52, 54 (D.Mass.1997). Where necessary, further facts are analyzed in the discussion below.

Plaintiffs reside part of the year in Massachusetts and part of the year elsewhere, although Schultz considers his permanent business and residential address to be Brimfield. (See Defs.' L.R. 56.1 Statement ¶ 1; Pls.' L.R. 56.1 Response ¶ 1 and ¶¶ 2, 3 of Exhibit A (Schultz's Affidavit) thereto.[3]) Since 1986, Plaintiffs have owned commercially-zoned property in Brimfield where they have conducted a business known as the "Brimfield Barn." (Defs.' L.R. 56.1 Statement ¶ 2.) The barn itself is a two-story, forty by eighty foot building. (Pls.' L.R. 56.1 Response, Exhibit A ¶ 43.)

Plaintiffs are not strangers to litigating issues surrounding certain aspects of Brimfield's "Junk Dealer Bylaw" (hereinafter "the bylaw").[4] At the center of the present action is that section of the bylaw which defines a "flea market ... as a place, primarily in the out-of-doors, where merchants buy, sell or barter merchandise on property for a consideration paid to the owner or operator of the property for temporary or seasonal use." (Defs.' L.R. 56.1 Statement ¶ 7 (quoting Article VIII, section (2)(A)(1) of the bylaw). A copy of the bylaw is attached as Exhibit A to Plaintiffs' Complaint (Docket No. 5).) The predominant question in this suit is whether and to what extent this definition of a "flea market" applies to Plaintiffs' operation of the Brimfield Barn. (Defs.' L.R. 56.1 Statement ¶ 8.)

The answer to the question is important because the bylaw imposes other obligations on flea markets, one of which is central to the parties' dispute—the prohibition of so-called "early-bird" sales, i.e., flea market sales prior to sunrise on the first official day. In this vein, the bylaw provides as follows:

(1) A flea market may be licensed and conducted for not more than six consecutive days and not more than three times per year. No licenses shall be issued for flea markets in any months except May, July, and September.

(2) The legal period shall begin on the second Tuesday in May, the first Tuesday after the Independence Day holiday in July, and the first Tuesday after the Labor Day holiday in September, except when religious holidays dictate otherwise....

(3) No vendor may display wares for sale or otherwise conduct business until sunrise on the first legal day, or after sunset on the last legal day. Daily busi-

---

Material Facts," while Plaintiffs' statement of "controverted" facts is hereinafter referred to as "Pls.' L.R. 56.1 Response."

**3.** Because the court allowed, without opposition, Defendants' motion to strike portions of Schultz's affidavit (see Docket No. 56), none of the stricken parts are relied upon in this report and recommendation.

**4.** In 1990, Plaintiffs sued Brimfield in both state and federal court challenging the application to them of certain portions of the bylaw. (Defs.' L.R. 56.1 Statement ¶ 4.) In sup-

port of those actions, Plaintiffs contended that certain Brimfield officials, not Defendants, although Kelly was named as a defendant in one of the actions, had harassed them in the operation of their business. (*Id.* ¶ 5; Pls.' L.R. 56.1 Response ¶ 2.) The 1990 lawsuits were ultimately dismissed. (Defs.' L.R. 56.1 Statement ¶ 6.) Plaintiffs also admit that "[i]n the past, [they] unsuccessfully sued the Town of Brewster[, Massachusetts,] on the same selective enforcement and equal protection grounds as in this action." (*Id.* ¶ 3.)

ness shall extend no longer than sunrise to sunset.

(Complaint, Exhibit A, Article VIII § 2(I).) In effect, the third subclause bars "early bird" sales.

Plaintiffs' position is that the bylaw does not pertain to the Brimfield Barn—and, by extension, their early bird shows—because their business is not conducted "primarily in the out-of-doors." (Defs.' L.R. 56.1 Statement ¶ 13.) Plaintiffs' early bird shows, which started in 1993, provide an opportunity for them and their vendors to sell wares "inside" the Brimfield Barn "on the Saturday, Sunday, and Monday just prior to the flea market periods ...." (Pls.' L.R. 56.1 Response, Exhibit A ¶¶ 54, 55; see also *id.* ¶ 58.) By seeking to bar such shows, Plaintiffs contend, Defendants have ignored the plain language of the phrase "primarily in the out-of-doors," as used in the bylaw definition of a "flea market." (See Defs.' L.R. 56.1 Statement ¶ 8 (citing Complaint ¶ 275).)

Prior to 1999, Defendants did not consider Plaintiffs' early bird shows to violate the bylaw; rather, they believed that Plaintiffs did not permit other vendors to operate within the Brimfield Barn. (See Defs.' L.R. 56.1 Statement, Exhibit F (Kelly's Affidavit) ¶ 8, Exhibit G (Klimczak's Affidavit) ¶ 8, and Exhibit H (Denning's Affidavit) ¶ 8. See also Defs.' Opp'n to Pls.' Cross–Motion for Summ. J., ("Docket No. 54, hereinafter Defs.' Opp'n Brief"), Exhibit 2 (Kelly's Second Affidavit) ¶ 4.) When Kelly realized that such vendors were in fact selling wares in the Brimfield Barn

during the "flea market"—which term, Defendants assert, applies to the thrice-yearly, week-long and town-wide event, i.e., the "aggregate event" (see Defs.' L.R. 56.1 Statement, Exhibit F ¶ 5, Exhibit G ¶ 5 and Exhibit H ¶ 5)—he determined that Plaintiffs' early bird shows violated the bylaw, (see Defs.' Opp'n Brief, Exhibit 2 ¶¶ 5–6).

Two additional facts should be kept in mind. First, Plaintiffs have never petitioned to amend the bylaw. (Defs.' L.R. 56.1 Statement ¶ 12.) Second, Plaintiffs have not yet secured a court decision interpreting the bylaw, particularly the meaning of the phrase "primarily in the out-of-doors." (*Id.*)

### III. *Procedural Background*

Plaintiffs' complaint, filed in state court on June 8, 1999, was removed here on the basis of diversity jurisdiction. While more scrupulously organized than most pro se submissions, the complaint is prolix; it contains 358 paragraphs and lists twelve separate counts.[5] In addition, each of the twelve counts claims that Defendants "conspired with malice" and all but one of the counts allege that such conspiracy was "in vindictive retaliation" for Plaintiffs' exercising their constitutional rights.

In due course, the parties filed cross motions for summary judgment. This court, to whom the motions were referred for a report and recommendation, heard oral argument. At oral argument, it became evident that Schultz alone conducts

---

**5.** Count I claims that Plaintiffs were denied an opinion from Town Counsel and alleges a violation of Mass. Gen. L. ch. 268A, § 22. Count II alleges that Defendants violated (i.e., "ignored") the bylaw. Count III asserts that Defendants have selectively enforced the law against Plaintiffs. Count IV alleges that Defendants have violated certain "open meeting" laws. Counts V and VI sound in defa-

mation. Counts VII through IX allege that Defendants have interfered with Plaintiffs' contractual relations and their "goodwill" with their vendors and customers. Count X alleges that Defendants have violated Plaintiffs' rights of privacy. Count XI asserts "discrimination." Count XII claims that Plaintiffs have been unlawfully put in a position of "business disadvantage."

Plaintiffs' litigation and that a number of the claims do not involve his wife at all.[6]

It also became evident at oral argument, as reflected in the papers, that the central focus of Plaintiffs' turgid complaint is Defendants' interpretation and application of the bylaw to Plaintiffs' business. Thus, Plaintiffs do not dispute Defendants' contention that they are principally attempting to secure a judicial determination as to the meaning of the bylaw phrase "primarily in the out-of-doors" insofar as that phrase is applied to the Brimfield Barn. In fact, as Defendants note, Schultz testified at deposition that "the heart of the matter" was Plaintiffs' contention "that the operation of the Brimfield Barn, whether an [e]arly [b]ird sale or not, . . . is not subject to the bylaw" "insofar as it is conducted solely indoors." (Defs.' L.R. 56.1 Statement, Exhibit A (Schultz's Deposition) at 125–26.) Thus, while their other claims are probably more than mere window dressing, Plaintiffs' core concern is the applicability of the bylaw to their business.

## IV. DISCUSSION OF CORE ISSUE

Count II of the complaint—excluding its allegations of constitutional violations or a retaliatory conspiracy, which are discussed below—reflects Plaintiffs' core desire that the court determine the applicability, if any, of "the plain language of the . . . [b]y-law" to the Brimfield Barn and the early bird shows conducted therein. (Complaint (Count II) ¶ 275.) Accordingly, the court will discuss it first. And because Count II also requests that the court "take any . . . action that [it] deems just and proper," (*id.* ¶ 278), it has deemed a declaratory judgment to be the best avenue for resolution of the issue. Fortunately, as described above, nearly every "fact" with respect to this issue is undisputed, thus simplifying the court's analysis.

■ The Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, gives a federal court the authority "[i]n a case of actual controversy within its jurisdiction" to declare the rights and other legal relations of any interested party. 28 U.S.C. § 2201.[7] The fact that Plaintiffs, proceeding pro se, have not specifically invoked the DJA is of no moment. *See id.* (stating that declaratory relief may be granted "whether or not further relief is or could be sought"); *Nemitz v. Norfolk & W. Ry. Co.*, 23 Ohio Misc. 78, 309 F.Supp. 575, 585 (N.D.Oh. 1969) ("Even where declaratory relief is not requested the courts may grant such relief where the pleading and proof show such to be appropriate.") (citing *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964)), *modified on other grounds*, 436 F.2d 841 (6th Cir.), *aff'd*, 404 U.S. 37, 92 S.Ct. 185, 30 L.Ed.2d

---

**6.** The court mentions this fact if for no other reason than to identify a potential problem should this case continue past the summary judgment stage. Plaintiffs should be aware that "[t]he federal courts have consistently rejected attempts at third-party lay representation." *Herrera–Venegas v. Sanchez–Rivera*, 681 F.2d 41, 42 (1st Cir.1982) (citing cases). There are "[m]any good reasons" for strict adherence to this rule, including the fact that: "a party may be bound, or his rights waived, by his legal representative"; "the lay advocate lacks many of the attorney's ethical responsibilities—for example, to avoid litigating unfounded or vexatious claims"; and that "non-lawyers . . . [often] present arguments in

an inarticulate, if not totally incomprehensible, manner." *Lewis v. Lenc–Smith Mfg. Co.*, 784 F.2d 829, 830 (7th Cir.1986) (citing, inter alia, *Herrera–Venegas*, 681 F.2d at 42).

**7.** The DJA "is mirrored by Fed.R.Civ.P. 57" and, as such, "[t]he statute and the rule are functionally equivalent." *Ernst & Young v. Depositors Economic Protection Corp.*, 45 F.3d 530, 534 n. 8 (1st Cir.1995). Rule 57 provides that "[t]he procedure for obtaining a declaratory judgment pursuant to Title 28, U.S.C. § 2201 shall be in accordance with these rules."

198 (1971); 10B CHARLES ALAN WRIGHT et al., FEDERAL PRACTICE AND PROCEDURE § 2768 n. 18 (1998) (similar). Defendants were well aware of Plaintiffs' concern in this regard as well as the court's understanding that the DJA, as designed, would enable the parties to clarify their legal rights and obligations before acting upon them further. *See Ernst & Young,* 45 F.3d at 534. *See also Step–Saver Data Sys., Inc. v. Wyse Tech.,* 912 F.2d 643, 649–50 (3d Cir.1990) (citing legislative history).

■ The question raised by Plaintiffs is easily stated: does the bylaw's definition of a "flea market" apply to the Brimfield Barn and the early bird shows conducted therein insofar as those activities are not conducted "primarily in the out-of-doors"? In the court's opinion, the answer to that question is "No." While the Brimfield Barn is a "place," at least in the generic sense, "where merchants buy, sell or barter merchandise on property for a consideration paid to the owner or operator of the property for temporary or seasonal use," neither it nor the early bird shows conducted therein are "primarily in the out-of-doors."

The parties have no real dispute as to the definition of the phrase "primarily in the out-of-doors." The word "primarily" is defined as "[c]hiefly" or "principally," American Heritage Dictionary: Second College Edition (1982); *see also* Webster's Third New International Dictionary (unabridged ed.1967) (defining "primarily" as "first of all: fundamentally, principally"), and the phrase "in the out-of-doors" is equally self-evident. As Plaintiffs point out, it means "not under a roof," but rather "subject to the elements of weather." (Pls.' L.R. 56.1 Response, Exhibit A ¶ 59.)

Defendants do not quibble with the fact that the Brimfield Barn, as an individual structure, is not "primarily in the out-of-doors." In this regard, it is undisputed that business at the Brimfield Barn, for the most part, is conducted "inside." Indeed, Schultz avers, without objection, that "[i]n 1999, a hurricane was forecast and vendors and customers from the open fields sought safe shelter *inside* the [Brimfield Barn] building." (Pls.' L.R. 56.1 Response, Exhibit A ¶ 44 (emphasis added.[8]))

Unfortunately, the word "place," as used in the bylaw, is not so easily defined. As Plaintiffs would have it, the word applies to individual locations, such as the Brimfield Barn. Indeed, one of the dictionary definitions of "place" is "an individual dwelling or estate." Webster's Third New International Dictionary (unabridged ed.1967). The Brimfield Barn, as Schultz avers without objection, is a two-story forty by eighty foot building. It has bathroom facilities, lighting and other indicia of an indoor facility and, apparently, meets the requirements for handicapped accessibility. (See Pls.' L.R. 56.1 Response, Exhibit A ¶ 43.) It is the "place," Plaintiffs assert, "inside" of which they and other vendors sell wares during flea market periods. (See *id.* ¶¶ 54, 55.)

Defendants would have the court define "place" more expansively. The very dictionary which defines "place" as an "individual dwelling" also defines it as "a particular region" and "an indefinite region or expanse." Webster's Third New International Dictionary (unabridged ed.1967). As Defendants would have it, the "place" is the entirety of the "flea market" which absorbs Brimfield's attention three times each year. There being no real dispute that the "Brimfield Flea Market," as an event, is held "primarily in the out-of-

---

**8.** The court notes that it struck other parts of paragraph 44 which Defendants argued vio-lated the best evidence rule. (See Docket No. 56 at 3–4.)

doors," the fact that the Brimfield Barn itself may be an indoor facility, Defendants argue, does not make it any less subject to the bylaw once Plaintiffs make the premises available to vendors.

The court believes that, as used in the bylaw, the word "place" has the more restrictive reading that Plaintiffs pursue, or, at least, yet another definition offered by Webster, "a building or locality used for a special purpose." Webster's Third New International Dictionary (unabridged ed.1967). Although, on occasion, the bylaw uses the term "flea market" in a singular sense, it never really denotes the "aggregate event" Defendants suggest. Rather, it tracks Plaintiffs' understanding. For example, the bylaw defines a "vendor" as an individual who "rents space within *a* flea market." (Complaint, Exhibit A, Article VIII § 2(A)(3) (emphasis added).) The bylaw also: describes licensing procedures for owner-operators "of flea markets" (*id.*, Article VIII § 2(B)); requires vendor permits to include the "[n]ames of the [f]lea [m]arkets" where the applicant will be doing business (*id.*, Article VIII § 2(C)(5)); and describes emergency services for the "flea markets" (*id.*, Article VIII, § 2(E)). At bottom, the bylaw talks of multiple flea markets taking place during the overall event itself.

To read the bylaw in the manner Defendants suggest would fracture its meaning. *See United States v. Carroll,* 105 F.3d 740, 744 (1st Cir.1997) ("Wherever possible, statutes should be construed in a common-sense manner, honoring plain meaning, and avoiding absurd or counter-intuitive results.") (citations omitted). Clearly, the presence of multiple flea markets during the overall "Brimfield Flea Market" event, for which the bylaw provides, belies the universal sense which Defendants may have wished for but did not achieve. Indeed, the standard permit issued by the town pursuant to the bylaw adopts the more restrictive meaning offered by Plaintiffs; it allows vendors to travel to "more than one flea market," and requires permits "at each flea market" when vendors have more than one location. (Complaint, Exhibit B.)

This is not to say that the bylaw is a paragon of clarity. In fact, Plaintiffs themselves have assumed that they and, in turn, their vendors are subject to some of its strictures. For example, Schultz has obtained a flea market owner-operator license since 1986 and has participated, both directly and indirectly, in obtaining permits for vendors operating inside the Brimfield Barn. If, however, the Brimfield Barn is not a "place primarily in the out-of-doors," as the court finds, then its operation cannot be deemed a "flea market" at all, at least as the bylaw currently reads, and Plaintiffs would appear to have no obligation to be licensed.

In short, this court believes that a declaratory judgment should enter which indicates that the bylaw definition of a "flea market" does not apply to Plaintiffs' Brimfield Barn or the early bird shows conducted therein. As so limited to that portion of Count II, the court will recommend that Defendants' motions for summary judgment be denied and that Plaintiffs' cross motion for summary judgment be allowed.

Still, there is more to this case than bylaw interpretation. In an effort to focus the litigation, the court gave the parties a period of time after oral argument to reach an agreement with respect to the remaining causes of action. No such agreement having been reached, (see Docket Nos. 70 and 71), the court, by necessity, proceeds to these numerous other claims.

## V. Defendants' Motions For Summary Judgment With Respect To Plaintiffs' Remaining Claims

In order to properly analyze Defendants' motions for summary judgment with

respect to Plaintiffs' remaining claims, the court must first state some additional undisputed facts proffered in Defendants' Local Rule 56.1 Statement. In so doing, the court will also consider Plaintiffs' factual responses thereto and, if there is a dispute, view the material facts and inferences in favor of Plaintiffs, the non-moving party. *See C.K. Smith & Co. v. Motiva Enterprises, LLC,* 269 F.3d 70, 72 (1st Cir.2001).

## A. FACTS

Each year, Schultz applies to Brimfield for a flea market owner-operator license. (Defs.' L.R. 56.1 Statement ¶ 15.) He is the sole licenseholder. (*Id.*) While Plaintiffs assert that all three defendants have, on occasion, delayed issuance of a license to Schultz, they admit that Denning and Klimczak, at least, have never suspended, revoked or outright failed to issue him a license. (Pls.' L.R. 56.1 Response ¶ 4; Defs.' L.R. 56.1 Statement ¶ 16.) Plaintiffs also admit the following: that they have never been cited for a violation of the bylaw or any violation in their operation of the Brimfield Barn; that they have never been the subject of a zoning enforcement prosecution or prosecuted as town employees; and that they have never missed a flea market due to late license issuance. (Defs.' L.R. 56.1 Statement ¶¶ 17, 18.)

In the Spring of 1999, Plaintiffs' flea market license application was approved by Defendants. (*Id.* ¶ 19.) As a result, Plaintiffs' vendors were allowed to sell at Plaintiffs' May 1999 early bird show. (*Id.* ¶ 21.) Nonetheless, Schultz decided to cancel Plaintiffs' June and September 1999 early bird shows. (*Id.* ¶ 21.) This is where the facts get somewhat odd.

Section 2(C) of the bylaw requires flea market owner-operators to be responsible for certain record-keeping of permits for vendors selling on their premises. (See

Complaint, Exhibit A, Article VIII § 2(C).) Apparently, Schultz was concerned that, because he "sold" flea market permits to his vendors—or at least "issued" permits to vendors and then "collected" permit fees—he might have a conflict of interest should he somehow be considered a municipal employee. (See *id.,* Exhibits I and K; Pls.' L.R. 56.1 Response ¶ 10.) Accordingly, in a letter dated March 3, 1999, Schultz requested an opinion from the State Ethics Commission regarding whether his sale of vendor permits made him a municipal employee for conflict of interest purposes under Mass. Gen. L. ch. 268A. (Defs.' L.R. 56.1 Statement ¶ 22.) In pertinent part, chapter 268A proscribes criminal conduct by certain public officials and employees.

In a response dated March 18, 1999, an attorney for the Ethics Commission opined that Schultz was indeed a municipal employee who was entitled to confer with Brimfield's Town Counsel. (*Id.* ¶ 24.) Schultz thereafter, in a letter which he captioned "confidential," requested access to Brimfield's Town Counsel from Defendants. (*Id.* ¶ 25.) In particular, Schultz wanted an opinion from counsel concerning "specific questions relative to [his] duties, responsibilities and interests when [he] acts for the town selling the Town's Individual Flea Market Vendor Permits." (Pls.' L.R. 56.1 Statement ¶ 38.) However, Schultz did not inform Defendants of his receipt of the Ethics Commission's March 18th letter. (Defs.' L.R. 56.1 statement ¶ 26.) Nor did he ask to appear, with or without counsel, before the Board of Selectmen to present his request. (*Id.*) Schultz's request for access to Town Counsel was discussed openly at the next Board of Selectmen meeting and denied. (*Id.* ¶¶ 27, 28.)

In a responsive letter to Schultz dated March 30, 1999, Defendants indicated that it had been their "practice" to allow flea

market owner-operators such as Schultz "to sell the individual permits as a courtesy and accommodation." (See *id.* ¶ 28 (citing Complaint, Exhibit N).) The letter advised Schultz that if he "elect[ed] to no longer undertake this task," Defendants would "be glad to sell [his] permits for [him]" and that Schultz should "[k]indly forward [his] dealer list to [Defendants] at [his] earliest convenience." (Complaint, Exhibit N.)

At their May 3, 1999 board meeting, by which time they had received and reviewed the March 18th letter from the Ethics Commission to Schultz, Defendants formally voted to relieve Plaintiffs of any obligation to issue vendor permits. (Defs.' L.R. 56.1 Statement ¶ 33.) Kelly avers without dispute that this decision was made because Plaintiffs had indicated to the Ethics Commission—as described in its March 18th letter—that they preferred to not sell permits anymore. (See *id.* (citing Kelly's Affidavit ¶ 18).) Defendants therefore sent an explanatory letter to Brimfield Barn vendors, dated May 7, 1999, in which they stated that "[t]his decision was made after several issues were brought to our attention over the previous weeks concerning the sales of such permits as well as early bird opening/sales offered by the Brimfield Barn." (Pls.' L.R. 56.1 Response ¶ 13.)

At the May 3rd meeting, Kelly also reaffirmed Defendants' position that no early selling outside of approved flea market periods would be allowed by *any* flea market owner-operator. (Defs.' L.R. 56.1

Statement ¶ 34.) In addition, Defendants informed all owner-operators of the town's willingness to sell vendor permits for them. (*Id.* ¶ 35.) Brimfield sold vendor permits for Plaintiffs in 1999 and Schultz did not object. (*Id.* ¶¶ 36, 37.)

Defendants' L.R. 56.1 Statement raises a number of additional undisputed facts. First, they point out that in 2000, Schultz elected to sell his own vendor permits. (*Id.* ¶ 37.) He did so by securing the permits from Brimfield without incident. (*Id.*) Second, Schultz, at his deposition, was unable to identify any vendor or patron who had not returned to the Brimfield Barn as a result of his cancelling the June and September 1999 early bird shows. (See Defs.' L.R. 56.1 Statement ¶ 42.) [9]

Third, Defendants each aver that he "ha[s] not become aware of any flea market owner/operators conducting early sales outside approved Flea Market dates." (See *id.*, ¶ 38 and exhibits referred to therein. [10]) Indeed, Brimfield has deployed officials and policemen immediately prior to the approved flea market dates to enforce the prohibition against early selling. (*Id.* ¶ 39.)

Finally, Defendants aver that the businesses of three owner-operators claimed by Plaintiffs to have been given permission to conduct early sales are distinguishable from that of Plaintiffs. (See *id.* ¶ 38 and exhibits referred to therein.) James Hopkins, Defendants aver, "is not a flea market owner/operator, but instead sells postcards year-round at his location." (See

---

**9.** To be sure, in a single paragraph of his thirty-six page, 175 paragraph affidavit filed in opposition to Defendants' summary judgment papers, Schultz identifies three vendors who, in part because of Defendants May 7, 1999 letter, have apparently informed him that they will no longer lease space at the Brimfield Barn. (See Shultz's Affidavit ¶ 163, referred to in Pls.' L.R. 56.1 Response ¶ 17.)

That paragraph, however, has been stricken from the summary judgment record. (See Docket No. 56.)

**10.** Although Plaintiffs point to a somewhat contrary statement (see Pls.' L.R. 56.1 Response ¶ 14), that statement was made in 1998 and dealt with a two-year period prior to the events at issue here.

¶ 24 of each affidavit referred to in Defs.' L.R. Statement ¶ 38.) Similarly, Defendants contend that "Suschana sells his own goods on a year-round basis at his location, and [Colleen] James conducts a year-round antiques cooperative." (*Id.*) Plaintiffs' response to these latter assertions is discussed below.

## B. *Discussion*

With all these facts in mind, the court will consider Defendants' summary judgment arguments, analyzing each of Plaintiffs' remaining causes of action in turn. The court first will consider the remaining federal claims and will then turn to the pendant state law claims.

### 1. *Conspiracy Allegations*

Plaintiffs' entire complaint is peppered with allegations that Defendants engaged in a malicious conspiracy of retaliation against them for exercising their constitutional rights. Both sides analyze these retaliatory conspiracy claims under 42 U.S.C. § 1985(3) and *Aulson v. Blanchard*, 83 F.3d 1 (1st Cir.1996).[11]

According to the First Circuit:

To state a claim under § 1985(3) a plaintiff must allege the existence of (1) a conspiracy, (2) a conspiratorial purpose to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person

or property, or (b) a deprivation of a constitutionally protected right or privilege.

*Id.* at 3 (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). Defendants focus principally on the second requirement, that there must be "a conspiratorial purpose to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws." *Id.* As both sides agree, this mandates that Plaintiffs show that the alleged conspiratorial conduct was "propelled by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" *Id.* (quoting *Griffin*, 403 U.S. at 102, 91 S.Ct. 1790).

In the court's estimation, Plaintiffs have not shown, nor can they show, that any alleged conspiratorial conduct by Defendants was propelled by a "class-based, invidiously discriminatory animus." At best, Plaintiffs argue in their memorandum of law that "[c]ertain registered voters in Brimfield, including Mrs. Schultz, signed a petition to recall Mr. Kelly and his outspoken supporter from their positions on the Board of Selectmen." (Pls.' Brief (included within Docket No. 50) at 4.) However, this "fact"—which appears to derive solely from a single paragraph in Schultz's affidavit—is not included in either Plaintiffs' Statement of Material Facts, their Local Rule 56.1 Response or their ninety-nine paragraph Local Rule 56.1 Statement in support of their cross motion for summary

---

**11.** In pertinent part, 42 U.S.C. § 1985(3) proscribes

two or more persons ... [from] conspir[ing] ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws[.] ... [I]n any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause

to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

judgment. It is, therefore, not properly before the court. *See* L.R. 56.1 (requiring motions for summary judgment to "include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried" and oppositions to "include a concise statement of the material facts of record as to which it is contended there exists a genuine issue to be tried").

■ Even if properly presented, however, Plaintiffs' allegation that they (or at least Mrs. Schultz) belong to an unspecified class of petition-signers falls sort of supporting their conspiracy claims for a number of reasons. First, it was just such an undefined group of political opponents that the First Circuit determined did not comprise a cognizable "class" for section 1985(3) purposes. *See Aulson,* 83 F.3d at 4 (rejecting § 1985(3) conspiracy claim premised upon membership in a " 'class' that is composed solely of persons who support candidates opposed to the politics of the" defendants and holding that such an "ad hoc 'opposition group' " is not a class). *See also LaManque v. Mass. Dep't of Employment & Training,* 3 F.Supp.2d 83, 91 (D.Mass.1998) (holding that whistleblowers are not a cognizable class for § 1985(3) purposes); *Columbus v. Biggio,* 76 F.Supp.2d 43, 50–51 (D.Mass.1999) (holding that, under § 1985(3), plaintiffs must show that they are members of "those groups which have been the historical victims of bias and discrimination, such as blacks, women, and ethnic groups").

Second, the purported "class" directed their activities only at Kelly and an unspecified "supporter." Klimczak and Denning are not mentioned and, therefore, cannot be swept into Plaintiffs' conspiracy and retaliation theories. *See* 42 U.S.C. § 1985(3) (limiting actions under this section to those "against any one or more of the conspirators").

Third, the petition drive took place in 1994 (see Pls.' L.R. 56.1 Response, Exhibit A ¶ 10), a full five years before any alleged conspiratorial retaliation. This fact alone severely undercuts, if not eviscerates, Plaintiffs' claim. *Cf. Ways v. City of Lincoln,* 909 F.Supp. 1316, 1325 (D.Neb.1995) (holding that five years between prior lawsuit and allegedly retaliatory acts too long to provide causal nexus). In short, there are ample grounds for the court to recommend that summary judgment enter in Defendants' favor with respect to Plaintiffs' conspiracy allegations.

2. *Count I: Alleged Denial of Opinion from Town Counsel*

■ In Count I, Plaintiffs claim that they were unconstitutionally deprived of their alleged "entitlement" under Mass. Gen. L. ch. 268A, § 22 to an opinion from Town Counsel. By using the term "entitlement," Plaintiffs appear to invoke the fourteenth amendment's due process clause. In the court's view, however, Plaintiffs' claim must fail under both substantive and procedural due process principles. The court reaches this conclusion without analyzing Defendants' alternative, and persuasive, qualified immunity argument.[12]

"Substantive due process, as a theory for constitutional redress, has been disfavored, in part because of its virtually standardless reach." *Licari v. Ferruzzi,* 22 F.3d 344, 350 (1st Cir.1994) (citation and

---

12. Defendants assert that they are qualifiedly immune from any due process claim made in Count I as Plaintiffs have proven neither that their "entitlement" to access to Town Counsel was "clearly established" nor that "reasonable person[s]" in Defendants' position would have known that denying Plaintiffs' request would have violated any clearly established right. *See Roldan–Plumey v. Cerezo–Suarez,* 115 F.3d 58, 65 (1st Cir.1997).

internal quotation marks omitted). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Plaintiffs, however, have not shown how access to Town Counsel is on par with such fundamental rights. Nor have they demonstrated how Defendants' refusal to provide such access was "shocking or violative of universal standards of decency," another required substantive due process element. *See Licari*, 22 F.3d at 350; *Furtado v. Bishop*, 604 F.2d 80, 95 (1st Cir.1979). Indeed, even if Plaintiffs could produce evidence of bad faith, which they have not, it would likely not be enough to transform Defendants' alleged "error" into a violation of substantive due process. *See PFZ Properties, Inc. v. Rodriguez*, 928 F.2d 28, 32 (1st Cir.1991).

As for procedural due process, "[t]o survive summary judgment ..., [P]laintiff[s] must allege evidence sufficient to establish four elements: that [D]efendants, (1) acting under color of state law, (2) deprived [P]laintiff[s] of (3) a property interest, as defined by state law, (4) without satisfactory process." *Welch v. Paicos*, 66 F.Supp.2d 138, 163 (D.Mass.1999) (citing *PFZ Properties, Inc.*, 928 F.2d at 30). Plaintiffs, however, have not described how an opinion from Town Counsel is a protected property interest. Nor have they identified any procedural safeguard to which they were allegedly entitled but was denied. In fact, nowhere in Plaintiffs' memorandum of law do they even mention alleged procedural due process violations. (See Pls.' Brief at 29–30 (indicating that "their arguments for their due process claims" have been "consolidated" into these two pages, but only discussing alleged violations of substantive due process).)

■] Finally, it appears that Plaintiffs were accorded all the process that was due. Plaintiffs' request, as Defendants point out, was addressed at a meeting of the Board of Selectmen where Schultz, had he appeared, would have been permitted to state the basis for the query. This opportunity, in the court's estimation, was sufficient. As the Supreme Court stated over four decades ago, the due process clause "does not require a trial-type hearing in every conceivable case of government impairment of private interest." *Cafeteria & Rest. Workers Union, Local 473 AFL–CIO v. McElroy*, 367 U.S. 886, 894, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Rather, "the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Id.* at 895, 81 S.Ct. 1743. *Cf. Dusenbery v. United States*, 534 U.S. 161, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002) (advocating case by case balancing in due process analyses).

### 3. *Count II: Alleged Violation of the Bylaw*

To the extent Count II seeks a declaratory judgment with respect to future applicability of the bylaw, a recommendation is offered in part IV of this report. Again, Count II contends that Defendants ignored the plain language of the bylaw by interpreting it to preclude Plaintiffs' early bird shows. Defendants, however, also describe Count II as alleging, albeit insufficiently, violations of substantive and procedural due process. (See Complaint ¶ 272 (alleging that Defendants' shutting down Plaintiffs' business was "without notification or a hearing").) Having considered the parties' positions in this regard, the court agrees with Defendants that, insofar as Count II alleges a violation of Plaintiffs' due process rights, Defendants' motion for summary judgment should be allowed.

First, as previously indicated, Plaintiffs put forth no response to Defendants' procedural due process arguments. As for substantive due process, Plaintiffs merely imply that Defendants have infringed their constitutionally protected property interests when, beginning in 1999, they ostensibly interpreted the bylaw so that Plaintiffs' early bird shows at the Brimfield Barn would no longer be allowed. Defendants, for their part, assert that Plaintiffs cannot show that, as a result of Defendants' allegedly erroneous bylaw interpretation, they were deprived of any constitutionally protected right. *See Roy v. City of Augusta*, 712 F.2d 1517, 1522 (1st Cir.1983) (noting that for a plaintiff's substantive due process claims to attain "constitutional magnitude" he must prove "that he was deprived of constitutionally protected property because of defendants' actions, and that the deprivation occurred without due process of law") (citing *Parratt v. Taylor*, 451 U.S. 527, 536–37, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)).

■ The fundamental flaw in Plaintiffs' substantive due process argument is factual. While Plaintiffs assert that Defendants have, on occasion, delayed issuance of a license, it is undisputed that Plaintiffs have never missed a flea market as a result. Plaintiffs also admit the following: that Denning and Klimczak, at least, have never suspended, revoked or outright failed to issue them a license; that Plaintiffs have never been cited for a violation of the bylaw or any violation in their operation of the Brimfield Barn; that they have never

been the subject of a zoning enforcement prosecution; and that they have never been prosecuted under Mass. Gen. L. ch. 268. Thus, while, in theory, a deprivation of Plaintiffs' ability to run their business might constitute a constitutional injury, *see Baer v. City of Wauwatosa*, 716 F.2d 1117, 1124 (7th Cir.1983) (opining, in dictum, that "[a gun] dealer who was refused a license for no reason could complain that he had been deprived of his property—the business he was forced to close for want of a license—without due process of law, because his property was taken away from him arbitrarily"),[13] no such loss has occurred here.

■ A final point: even if there were a constitutional deprivation—which the court does not believe to be the case—Plaintiffs' asserted right to conduct early bird shows in particular was not clearly established at any relevant time. As described, Plaintiffs' case rests on a claim that their early bird shows are not subject to the bylaw because they were not conducted "primarily in the out-of-doors." As Defendants point out, however, no court has interpreted the bylaw until now. Accordingly, at the very least, Defendants are entitled to qualified immunity from the constitutional claims Plaintiffs make in Count II. *See Roldan–Plumey*, 115 F.3d at 65 (noting that political discrimination defendants are entitled to qualified immunity where their allegedly unconstitutional actions took place prior to the development of clearly established law in a particular area).

---

**13.** *But see Licari,* 22 F.3d at 350 ("Our cases make clear that a regulatory board does not transgress constitutional due process requirements merely by making decisions for erroneous reasons or by making demands which arguably exceed its authority under the relevant state statutes") (citations and internal quotation marks omitted); *PFZ Properties, Inc.,* 928 F.2d at 31–32 (holding that a bad faith refusal to follow state law in local ad-

ministrative matters does not amount to deprivation of substantive due process where state courts are available to correct the error); *Leisure Time Cruise Corp. v. Town of Barnstable,* 62 F.Supp.2d 202, 209 (D.Mass.1999) (holding that board of health enforcement action, even if motivated by improper purpose of shutting down plaintiff's business, did not amount to deprivation of substantive due process).

#### 4. *Counts III, XI and XII: Equal Protection Allegations*

The parties generically refer to Counts III, XI and XII as Plaintiffs' "equal protection" causes of action. In Count III, Plaintiffs allege that Defendants conspired to selectively enforce the laws against them in retaliation for exercising their constitutional rights. In Count XI, Plaintiffs assert that Defendants conspired to discriminate against them for the same retaliatory reason. Finally, in Count XIII, Plaintiffs contend that Defendants conspired to place them at a business disadvantage with other similarly-situated businesses, in retaliation for Plaintiffs' exercise of their constitutional rights.

These three counts, as Defendants point out, appear to be based on two theories: that Defendants selectively enforced the bylaw so as to prohibit Plaintiffs' early bird shows and that Defendants selectively relieved Plaintiffs of the responsibility of issuing vendor permits. The court also believes that a third equal protection allegation lurks in Plaintiffs' complaint, namely, that Defendants selectively required Schultz to provide a list of his vendors prior to the issuance of Plaintiffs' vendor permits. In the court's view, Defendants are entitled to summary judgment with respect to each theory.

##### a. *enforcement of the bylaw*

In order to establish that they were denied equal protection of the laws as a result of Defendants' selective enforcement of the bylaw, Plaintiffs must show, first, that they, "compared with others similarly situated, w[ere] selectively treated," and second, "that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure [them]." *Rubinovitz v. Rogato*, 60 F.3d 906, 909–10 (1st Cir.1995). To meet their burden of proof, Plaintiffs must "identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently, instances which have the capacity to demonstrate that [Plaintiffs] were singled out for unlawful oppression." *Id.* at 910 (citation and internal quotation marks omitted). Otherwise, Plaintiffs' equal protection claims cannot survive. *See Jacobs v. Town of Scituate*, 948 F.Supp. 7, 9–10 (D.Mass.1996).

As an initial matter, Defendants assert that the individuals identified by Schultz at his deposition as being "similarly situated" to Plaintiffs—James Hopper, Stephen Suschana and Colleen James—are not. Indeed, Defendants aver without dispute that Hopkins is not a flea market owner-operator but instead sells postcards year-round at his location, that Suschana sells his own goods on a year-round basis at his location and that James conducts a year-round antiques cooperative. Thus, Defendants argue, Plaintiffs' factual claim that they were treated differently than similarly situated individuals, is completely unsupported and entitled to no weight. *See Rivera–Cotto v. Rivera*, 38 F.3d 611, 615 (1st Cir.1994).[14]

Plaintiffs' factual assertion, in the court's estimation, cannot be so readily dismissed. Defendants appear to proceed on the assumption that the telling difference between Plaintiffs and these three other individuals is that Plaintiffs operate the Brimfield Barn for only six months of

---

**14.** To be sure, in their opposition memorandum, Plaintiffs identify, via Schultz's affidavit, Arthur Perigard and Frank Lombard as additional examples of allegedly "similarly situated" individuals. However, the portions of Schultz's affidavit in which these individuals are discussed (¶¶ 51, 78, 79) have been stricken from the summary judgment record. (See Docket No. 56.)

the year, whereas the others operate their businesses year-round. Indeed, the bylaw refers to "consideration paid to an owner or operator of the property for temporary or seasonal use."

In the court's opinion, the comparison to be made between Plaintiffs and the three cited individuals is not the temporal nature of their businesses but the indoor location of those businesses. After all, the definition of a flea market, as explained, requires that it be "primarily in the out-of-doors." That definition being inapplicable to Plaintiffs' Brimfield Barn and, evidently, to the three other businesses, all four businesses appear to be similarly situated.

This analysis, however, gets Plaintiffs just so far. In the court's view, as already exhaustively described, there is simply no evidence that Plaintiffs "were singled out for unlawful oppression." *Rubinovitz*, 60 F.3d at 910. Some other distinctions were also present, e.g., the fact that Plaintiffs allowed other vendors to operate out of their indoor facility. Thus, even if Defendants' interpretation of the bylaw was in error, there is simply no evidence that their "selective enforcement" was grounded in a malicious or bad faith intent to injure Plaintiffs. Quite to the contrary, it appears that Defendants' interpretation of the bylaw was always pursued in good faith.

█ Still, giving Plaintiffs the benefit of every doubt, it is conceivable that they seek to portray themselves as a "class of one"—or in their case "two"—and thus, seek shelter under *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). Even were this such a case, however, *Olech* makes clear that "class of one" plaintiffs must still prove "that [they have] been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564,

120 S.Ct. 1073 (citations omitted). *Accord Pariseau v. City of Brockton*, 135 F.Supp.2d 257, 263 (D.Mass.2001). For all the reasons stated, Plaintiffs can make no such showing here.

### b. *issuance of vendor permits*

Plaintiffs' first alternative equal protection claim, that they were treated differently from other flea market operators when Defendants allegedly relieved them of the responsibility of issuing vendor permits, is similarly misplaced. This claim is based on an allegation that Defendants gave other owner-operators, but not Plaintiffs, the option of issuing vendor permits. Defendants, however, notified *all* owner-operators that the option of having the town issue permits was up to them. At the same time, Defendants voted to assume the responsibility of issuing Plaintiffs' permits for 1999, only because Plaintiffs specifically stated that they did not wish to do so. Moreover, as noted, Plaintiffs did not object to Defendants' issuance of their permits in 1999. Plaintiffs cannot now claim that they failed to agree to this arrangement.

### c. *vendor lists*

Plaintiffs also allege in their complaint that Defendants "discriminated against" them "by *requiring* Schultz to provide a vendor list prior to the issuance of his vendor permits." (Complaint ¶ 133 (emphasis added).) Defendants assert that Plaintiffs' allegation is misplaced given that vendor lists are not "confidential." (Defs.' L.R. 56.1 Statement ¶ 31.) Plaintiffs, in response, contend that the Town Clerk has never kept the names of vendors and that some owner-operators maintain the confidentiality of their lists by not submitting them to the town, presumably without recourse. (See Pls.' L.R. 56.1 Response ¶¶ 11, 12.)

The only support for Plaintiffs' latter statement is paragraph 109 of Schultz's affidavit. Of course, Schultz is unqualified to testify with respect to what the Town Clerk does or does not do. For this reason, the court has stricken paragraph 109 from the summary judgment record. (See Docket No. 56.) More importantly, Schultz's personal belief to the contrary, at least one other individual was "required" to submit "a list of names and addresses for the list of vendors prior to picking up [his] permit[s]." (Defs.' L.R. 56.1 Statement ¶ 32, Exhibit D at 28.) Thus, there is no strength to that portion of Plaintiffs' equal protection claims which asserts they were treated differently with respect to the vendor lists.

### 5. Count X: Alleged Violation of Plaintiffs' Rights of Privacy

The sole basis for Plaintiffs' invasion of privacy claim is Defendants' open discussion at a Board of Selectmen meeting of Schultz's letter—marked by him as "confidential"—requesting, as an alleged "employee" of the town, access to Town Counsel. (See Defs.' L.R. 56.1 Statement ¶ 28.) For the reasons indicated below, the court believes that this claim cannot be maintained and that Defendants' motion for summary judgment with respect to Count X should be allowed. This is so whether the claim is viewed through the lens of the fourth amendment, the fourteenth amendment's due process clause or state law, i.e., Mass. Gen L. ch. 214, § 1B (stating that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy").

■ The fourth amendment protects against personal intrusions by the government only if the challenged conduct infringes upon a reasonable expectation of privacy. See Vega–Rodriguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir.

1997). The fourth amendment, however, is not implicated in this case because Plaintiffs were not compelled to disclose the information in the letter, but rather, voluntarily submitted it to Defendants. The mere fact that it was marked "confidential" is of little moment. See Alinovi v. Worcester Sch. Comm., 777 F.2d 776, 783 (1st Cir.1985) (holding that plaintiff is not entitled to fourth amendment protection where, even though she sought to keep document confidential from one official, she "voluntarily offered it" to several others). Compare Parks v. FDIC, 65 F.3d 207, 213 (1st Cir.1995) (finding fourth amendment invasion of privacy claim stated where officials "rummage[d] through the financial papers of private citizens" without consent).

As for the fourteenth amendment, "'[o]nly personal rights that can be deemed fundamental or implicit in the concept of ordered liberty are included in the due process guarantee of personal privacy.'" Roe v. Farwell, 999 F.Supp. 174, 196 (D.Mass.1998) (quoting Roe v. Wade, 410 U.S. 113, 152, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)). No such rights are implicated here. See Vega–Rodriguez, 110 F.3d at 183 (holding that fourteenth amendment right to privacy does not extend beyond the disclosure of medical, financial and similar "intimately personal data").

■ Finally, with respect to state law, all documents received by the Board of Selectmen are public records, unless a statutory exemption applies. See Wakefield Teachers Ass'n v. Sch. Comm. of Wakefield, 431 Mass. 792, 731 N.E.2d 63, 66 (2000) (citing Mass. Gen. L. ch. 66, § 10). The one such exemption which might theoretically apply, the so-called "privacy" exemption of Mass. Gen. L. ch. 4, § 7, cl. 26(c) (excepting any "materials or data relating to a specifically named individual, the disclosure of which may

constitute an unwarranted invasion of personal privacy"), simply does not apply here in fact. The types of information the privacy exemption is designed to protect are "intimate details" of a "highly personal" nature such as "marital status, legitimacy of children, identity of fathers of children, medical condition, welfare payments, alcoholic consumption, family fights and reputation," *Attorney Gen. v. Ass't Comm'r of Real Property Dep't of Boston,* 380 Mass. 623, 404 N.E.2d 1254, 1256 n. 2 (1980) (citations and internal quotations marks omitted), not, as here, information pertaining to whether an individual is a town employee or not.[15]

### 6. *Counts IV through IX: Remaining State–Law Claims*

Should the district court adopt this recommendation with respect to Plaintiffs' federal claims it could decline to exercise supplemental jurisdiction over Counts IV through IX which are based exclusively on state law. *See* 28 U.S.C. § 1367(c). In the interests of judicial economy, convenience and fairness to the parties, however, this court will further recommend that the district court exercise its supplemental jurisdiction over the remaining state law claims and enter summary judgment in Defendants' favor for the reasons which follow.

a. *Count IV: alleged violation of Massachusetts "open meeting" law*

■ The Massachusetts open meeting law, Mass. Gen. L. ch. 39, § 23B, does not permit an individual plaintiff (or two) to file a private cause of action to enforce its provisions. *See Vining Disposal Service,*

*Inc. v. Bd. of Selectmen of Westford,* 416 Mass. 35, 616 N.E.2d 1065, 1067–68 (1993). Rather, the statute specifically provides that it may only be enforced "by complaint of three or more registered voters, by the attorney general, or by the district attorney." Mass. Gen. L. ch. 39, § 23B. In the case at bar, there are only two Plaintiffs and neither the Attorney General nor the District Attorney have made a complaint. As a result, Plaintiffs lack standing to pursue an open meeting law claim and summary judgment should enter in Defendants' favor on Count IV.[16]

b. *Counts VII through IX: alleged interference with contractual relations and "goodwill"*

■ Plaintiffs also allege that Defendants intentionally interfered with contracts between them and their vendors (Counts VII and VIII) as well as between Plaintiffs and their own customers (Count IX). "To establish intentional interference with contractual or business relations, [P]laintiffs must show (1) the existence of a contract or a business relationship which contemplated economic benefit; (2)[D]efendants' knowledge of the contract or business relationship; (3)[D]efendants' intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages." *Swanset Dev. Corp. v. City of Taunton,* 423 Mass. 390, 668 N.E.2d 333, 339 (1996) (citing *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 551 N.E.2d 20, 21–23 (1990)). Plaintiffs' claims fall short at least with respect to the third

---

**15.** Nor does any exemption which might pertain to fifth amendment rights against self incrimination, as Plaintiffs argue, apply. The undisputed facts reveal that Plaintiffs were never in any danger of being prosecuted for anything.

**16.** It is also significant that a lawyer at the District Attorney's office found no open meeting violations by Defendants. (Defs.' L.R. 56.1 Statement ¶ 41; Pls.' L.R. 56.1 Response ¶ 16.)

and fourth elements and therefore must fail in their entirety.

There is no evidence that Defendants actually interfered with any contract or business relationship or that Plaintiffs suffered any damages as a result thereof. For one thing, Plaintiffs have made no attempt to show actual monetary damages with respect to these claims except in two paragraphs of Schultz's affidavit which have been stricken from the summary judgment record. (See Docket No. 56 (striking, in part, ¶¶ 174 and 175 of Schultz's Affidavit).)[17] It should also be remembered that Defendants permitted Plaintiffs to put on their last scheduled early bird show, in May of 1999, and that it was Schultz who chose to cancel Plaintiffs' early bird shows in July and September of 1999. This is undisputed.

Relatedly, Plaintiffs have failed to identify any vendors or customers who have stopped doing business with them due to Defendants' alleged conduct. Granted, in their memorandum of law, Plaintiffs claim that two vendors disassociated with Plaintiffs as a result of Defendants' actions, (see Pls.' Brief at 14), but, upon further inquiry, those "facts" are unsupported. The first vendor merely states in his affidavit that, "in May of 2000," after the events at issue here, he decided not to return to the Brimfield Barn "[b]ecause of [his] age and the uncertainty of the status of the 'Early Bird Show.'" (Pls.' L.R. 56.1 Response, Exhibit D ¶ 47.) Similarly, the second vendor

gives reasons completely unrelated to Defendants' alleged conduct for leaving the Brimfield Barn after the 1999 season: "I tried to participate in two of the [1999 Brimfield Barn] shows ..., but it was too physically strenuous for me. So, after September 1999 I did not reserve my space at the Brimfield Barn any longer." (*Id.*, Exhibit E ¶ 25.)[18] For all these reasons, then, court will recommend that Defendants be granted summary judgment with respect to Counts VII through IX.

#### c. *Counts V and VI: defamation allegations*

Finally, in Count V, Plaintiffs allege that Defendants made false and defamatory statements about them, and, in Count VI, Plaintiffs allege that Defendants damaged Plaintiffs' reputation and credibility. Defendants, in their motions for summary judgment, assert that any alleged statements they made were not defamatory as a matter of law and that, even if they were, Plaintiffs suffered no damages as a result.

Plaintiffs do not mention Count VI in their opposition to Defendants' motions for summary judgment. The court, therefore, will treat that count as abandoned and will recommend that Plaintiffs be granted summary judgment thereon. Even so, the following discussion indicates that, like Count V, Defendants are entitled to summary judgment with respect to the merits of Count VI.

---

**17.** Even if they were properly presented, the stricken paragraphs have no evidentiary support, and, thus, cannot be credited. The paragraphs contain nothing more than Schultz's "estimate" that the value of Plaintiffs' goodwill is $600,000 and the value of their reputation and credibility is $250,000 (Pls.' L.R. 56.1 Response, Exhibit A ¶¶ 174, 175); *see Rivera–Cotto*, 38 F.3d at 615 ("'To forestall summary judgment, we require more than unsubstantial conclusions, backed by only a few uncoordinated evidentiary frag-

ments.") (citation and internal quotation marks omitted).

**18.** A third (unnamed) vendor is also mentioned in Plaintiffs' memorandum of law, but the paragraphs of Schultz's affidavit with respect to him have been stricken from the summary judgment record. (See Pls.' Brief at 14 (citing Schultz's Affidavit ¶¶ 163–65); Docket No. 56 (striking paragraphs 163–65).)

The scope of Plaintiffs' defamation claims against Defendants are limited to the statements alleged in the complaint. *See Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 728 n. 6 (1st Cir.1992) (holding that statements raised by plaintiff in brief but not in complaint are not actionable); *Chiara v. Dizoglio*, 81 F.Supp.2d 242, 248 (D.Mass.2000) (noting heightened pleading requirement for defamation actions), *aff'd*, 2001 WL 288613 (1st Cir. Mar. 19, 2001). Moreover, "[t]he Massachusetts Supreme Judicial Court has stated that defamation traditionally is a disfavored action, and that 'courts have applied a stricter standard to complaints for defamation by requiring defamation plaintiffs to plead the elements of their claims with specificity.' " *Dorn v. Astra USA*, 975 F.Supp. 388, 395–96 (D.Mass. 1997) (quoting *Eyal v. Helen Broadcasting Corp.*, 411 Mass. 426, 583 N.E.2d 228, 231 n. 7 (1991)) (further citations omitted).

█ Here, the complaint sets forth no defamatory statements allegedly made by Klimczak. Thus, he should be granted summary judgment with respect to Counts V and VI. As for Kelly, the complaint alleges that he publicly:

- informed vendors that what Plaintiffs were doing is illegal and that their "beef" is with Schultz (Complaint ¶ 188);
- stated it was necessary to mail a copy of the bylaw to Plaintiffs' vendors so that they would not be "victimized" any longer (*id.* ¶ 247);
- stated that Schultz's actions were "just part of the spirit of cooperation that we've come to expect [from him]" and that "we have a long history here of someone who likes to try and see how much time they can waste with this [board]" (*id.* ¶ 250);
- stated that Schultz had cost the town around $500 in legal fees and that his actions were "[j]ust another way to waste more of our time, effort and money" (*id.* ¶ 251); and
- stated that "I don't feel it is appropriate to have anyone, in particular, Mr. Schultz in light of his relationship, long relationship, with the town, to be calling Melissa [McMullen, the Recording Secretary,] at home" (*id.* ¶ 252).

With respect to Denning, the complaint alleges that he publically stated the following:

- that the number of vendor permits issued by Plaintiffs is "just a blip on the screen" (*id.* ¶ 155);
- that "I was especially pleased to receive my trespass notice from the Chief of Police" and that "it was a nice little touch" (*id.* ¶ 249);
- that Schultz's call to the Recording Secretary was "malicious" (*id.* ¶ 253); and
- that "[t]he hits just keep on coming[.] . . . [I]f [Schultz] can't manage his own business, we'll be happy to do it for him[.] . . . [I]f he is working for the Town he's not doing a very good job" (*id.* ¶ 119).

In order to recover on their defamation claims against Kelly and Denning, Plaintiffs must establish that the particular words "ridicule[ed] or treat[ed] [Plaintiffs] with contempt" or "discredit[ed] [them] in the minds of any considerable and respectable segment in the community" *Draghetti v. Chmielewski*, 416 Mass. 808, 626 N.E.2d 862, 866 (1994) (citations and internal quotation marks omitted). Still, statements of pure opinion are constitutionally protected, *see King v. Globe Newspaper Co.*, 400 Mass. 705, 512 N.E.2d 241, 243–44 (1987); no statement of belief based upon a disclosed factual basis (even if that basis proves false) is actionable, *see Fleming v. Benzaquin*, 390 Mass. 175, 454 N.E.2d 95, 104 (1983); "statements of rhetorical hyperbole," particularly if made "in the context of a heated political" question, are less

likely to be defamatory, *Lyons v. Globe Newspaper Co.*, 415 Mass. 258, 612 N.E.2d 1158, 1162, 1164 (1993); and mere statements of "vituperation and verbal abuse" cannot reasonably be construed as statements of fact and may not give rise to liability on a defamation theory, *id.* at 1162 n. 6.

In the case at bar, there appears to be no evidence that Kelly or Denning's words, even if they ridiculed Plaintiffs, did so "in the minds of any considerable and respectable segment of the community." Even were there such evidence, the words, at most, appear to be non-actionable opinions, beliefs or political rhetoric. Further, Plaintiffs themselves have admitted that no one has stated that they view them in a negative light because of Kelly's and Denning's alleged comments. Similarly, Schultz, at his deposition, was unable to identify any vendor or patron who had not returned to Plaintiffs' premises as a result of the cancelling of any early bird show. (See Defs.' L.R. 56.1 Statement ¶ 40.)[19] Thus, any damages Plaintiffs may have suffered are suspect at best. *See Bander v. Metropolitan Life Ins. Co.*, 313 Mass. 337, 47 N.E.2d 595, 601 (1943) (holding that the plaintiff could not recover for defamation on basis that he was refused employment after slanderous statements were made because he failed to show a causal connection between refusal and the defendant's statements). For all these reasons, the court will recommend that Defendants be granted summary judgment with respect to Counts V and VI.

### VI. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

As indicated above, the court believes that, except for a limited portion of Count II, Defendants are entitled to summary judgment with respect to each of Plaintiffs' remaining claims. In reaching this conclusion, the court has reviewed the facts and inferences, pursuant to appropriate summary judgment praxis, in a light most favorable to Plaintiffs. It is, therefore, logically impossible to grant Plaintiffs summary judgment on their remaining claims since, in doing so, the facts and inferences would have to be stated less favorably to them and more favorably to Defendants. As a result, the court will recommend that, except as described above in part IV, Plaintiffs' motion for summary judgment be denied.

### VII. CONCLUSION

For the foregoing reasons, the court recommends as follows:

(1) that Defendants' motions for summary judgment (Docket Nos. 44, 45 and 46) be DENIED insofar as Plaintiffs are seeking a limited declaratory judgment with respect to Count II, but otherwise ALLOWED;

(2) that Plaintiffs' motion for summary judgment (Docket No. 50) be ALLOWED insofar as they are seeking a limited declaratory judgment with respect to Count II, but otherwise DENIED; and

(3) that pursuant to 28 U.S.C. § 2201 the district court declare in the context of Count II that the bylaw's definition of a "flea market" does not apply to the Brimfield Barn and Plaintiffs' early bird shows conducted therein to the extent those activities are not conducted "pri-

---

**19.** The only contrary evidence Plaintiffs put forward to these assertions is, as indicated with respect to the interference with contractual reactions and goodwill claims, either off-base (see Pls.' L.R. 56.1 Response ¶ 15 and Exhibits D (¶ 47) and E (¶ 25) thereto), or not part of the summary judgment record (see *id.* and Exhibit A (¶¶ 163–65) thereto).

marily in the out-of-doors." [20]

**20.** The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court within ten (10) days of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega*, 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn*, 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.